IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Deborah Jean Johnson, | ) | C/A No. 0:15-4666-DCN-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 (D.S.C.). The plaintiff, Deborah Jean Johnson, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the defendant, Acting Commissioner of Social Security ("Commissioner"), denying her claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Having carefully considered the parties' submissions and the applicable law, the court concludes that the Commissioner's decision should be affirmed.

## SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 423(d)(1)(A), (d)(5) and § 1382c(a)(3)(H)(i), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); see also Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1973). The regulations require the Administrative Law Judge ("ALJ") to consider, in sequence:

PJG

(1)     whether the claimant is engaged in substantial gainful activity;

(2)     whether the claimant has a "severe" impairment;

(3)     whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), and is thus presumptively disabled;

(4)     whether the claimant can perform her past relevant work; and

(5)     whether the claimant's impairments prevent her from doing any other kind of work.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[1]  If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  Id.

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform alternative jobs that exist in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); see also McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980).  The Commissioner may carry this burden by obtaining testimony from a vocational expert.  Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

---

[1] The court observes that effective August 24, 2012, ALJs may engage in an expedited process which permits the ALJs to bypass the fourth step of the sequential process under certain circumstances.  20 C.F.R. §§ 404.1520(h), 416.920(h).



## ADMINISTRATIVE PROCEEDINGS

In July 2012 and August 2012, Johnson applied for SSI and DIB, respectively, alleging disability beginning January 25, 2004. Johnson's applications were denied initially and upon reconsideration, and she requested a hearing before an ALJ. A hearing was held on June 5, 2014 at which Johnson, who was represented by Dennis Pash, Esquire, appeared and testified. After hearing testimony from a vocational expert, the ALJ issued a decision on June 26, 2014 concluding that Johnson was not disabled from January 25, 2004 through the date of the decision. (Tr. 12-26.)

Johnson was born in 1965 and was thirty-eight years old at the time of her alleged disability onset date. (Tr. 24.) She has a eighth-grade education and past relevant work experience as a retail store associate and a child care assistant at a church nursery. (Tr. 226.) Johnson alleged disability due to nerves, her back, pancreatitis, an enlarged liver, high blood pressure, and diabetes. (Tr. 225.)

In applying the five-step sequential process, the ALJ found that Johnson had not engaged in substantial gainful activity since January 25, 2004—her alleged onset date. The ALJ also determined that Johnson's borderline intellectual functioning, lumbar spondylosis, pancreatitis, and bilateral kidney stones were a severe combination of impairments. However, the ALJ found that Johnson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (the "Listings"). The ALJ found that Johnson retained the residual functional capacity to

> perform light work[] as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can perform postural activities occasionally. The work, which she can do, is limited to occupations, which involve the performance of simple, routine, repetitive tasks.

(Tr. 19.) The ALJ found that Johnson was unable to perform past relevant work but that, considering Johnson's age, education, work experience, and residual functional capacity, there were jobs that



existed in significant numbers in the national economy that Johnson could perform. Therefore, the ALJ found that Johnson was not disabled from January 25, 2004 through the date of the decision.

The Appeals Council denied Johnson's request for review on October 27, 2015, making the decision of the ALJ the final action of the Commissioner. (Tr. 1-3.) This action followed.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Thus, the court may review only whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589. In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Id. Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence. Blalock, 483 F.2d at 775.

## ISSUES

Johnson raises the following issues for this judicial review:

I.     The ALJ erred in his consideration of the combination of impairments;

II.    The ALJ erred in his 12.05 Listing analysis; and



III.    The ALJ's RFC analysis is flawed and not based on substantial evidence.

(Pl.'s Br., ECF No. 17.)

## DISCUSSION

### A.    Combination of Impairments

Johnson argues that the ALJ erred in failing to consider her impairments in combination.

When a claimant has more than one impairment, the ALJ must consider the combined effect of all

impairments without regard to whether any such impairment, if considered separately, would be of

sufficient severity to be the basis of eligibility under the law.  20 C.F.R. §§ 404.1523, 416.923.

Further, in Walker v. Bowen, 889 F.2d 47, 49-50 (4th Cir. 1989), the United States Court of Appeals

for the Fourth Circuit explained:

> [A] failure to establish disability under the listings by reference to a single, separate
> impairment does not prevent a disability award.  It is axiomatic that disability may
> result from a number of impairments which, taken separately, might not be disabling,
> but whose total effect, taken together, is to render claimant unable to engage in
> substantial gainful activity.  In recognizing this principle, this Court has on numerous
> occasions held that in evaluating the effect[] of various impairments upon a disability
> benefit claimant, the Secretary must consider the combined effect of a claimant's
> impairments and not fragmentize them. . . . As a corollary to this rule, the ALJ must
> adequately explain his or her evaluation of the combined effects of the impairments.

Id. at 49-50 (internal citations omitted).  However, "the adequacy requirement of Walker is met if

it is clear from the decision as a whole that the Commissioner considered the combined effect of a

claimant's impairments." Brown v. Astrue, C/A No. 0:10-cv-1584-RBH, 2012 WL 3716792, at *6

(D.S.C. Aug. 28, 2012) (citing Green v. Chater, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir.

1995)).

Most importantly, when multiple impairments are present, this Court must be
satisfied that the ALJ's decision regarding disability is not founded on a fragmentized
analysis of those impairments.  If the ALJ's analysis is fragmentized, it is, of course,
the Plaintiff's task to adequately show the Court that the ALJ's decision could have



been different had [he] done an adequate combined effect analysis of Plaintiff's multiple impairments.

Cox v. Colvin, No. 9:13-CV-2666-RBH, 2015 WL 1519763, at *6 (D.S.C. Mar. 31, 2015) (internal citation omitted).

As an initial matter, the court observes that all of Johnson's arguments appear to be directed toward the residual functional capacity assessment rather than the ALJ's determination that Johnson's impairments do not equal a particular Listing, as Johnson does not direct the court to any particular Listing that her impairments may equal. Regardless of which step of the sequential process Johnson's arguments are directed towards, the court finds that for the reasons that follow, and contrary to Johnson's arguments, the ALJ sufficiently discussed Johnson's alleged impairments and limitations so as to demonstrate that he considered her impairments in combination.

Johnson first appears to argue that in finding her gastroesophageal reflux disease, diabetes, obesity, and hypertension were nonsevere impairments, the ALJ failed to account for Johnson's testimony that she was not taking all of her medications because she was unable to afford them and failed to acknowledge a note in the medical record indicating poor compliance in managing her diabetes.[2] However, Johnson has failed to explain how this argument, even if true, would show that the result would have been different if the ALJ had made this acknowledgment. Moreover, later in

---

[2] Johnson also argues that the ALJ ignored an alleged nine additional physical and psychological impairments in the decision. However, the support, to which Johnson directs the court's attention, consists primarily of records containing a single notation of a possible diagnosis or history of the alleged impairment without any additional information. Moreover, as pointed out by the Commissioner, Johnson did not allege that any of the additional alleged impairments were disabling when she filed for disability or on appeal, nor has she alleged how these additional impairments would support the inclusion of any additional limitations. (See Def.'s Br. at 12 n.5, ECF No. 20 at 12 n.5 (citing Tr. 225, 261)). Further, it is clear from the ALJ's decision that he considered Johnson's alleged additional psychological impairments throughout the decision.



the decision the ALJ specifically considered the medical note indicating that Johnson had poor compliance in managing her diabetes.

Johnson also directs the court to an evaluation completed by Dr. James H. Way opining that Johnson was capable of simple, rote occupational tasks, but was "unlikely to be able to function even to this potential occupationally secondary to anxiety disorder, decreased confidence, and poor coping skills." (Pl.'s Br. at 13, ECF No. 17 at 13 (citing Tr. 286-89)). Johnson appears to rely on this opinion to support her position that her impairments together result in additional limitations; however, as acknowledged by Johnson, the ALJ specifically considered this opinion and accorded this portion limited weight. Johnson challenges the ALJ's determination, but for the reasons discussed more fully below, Johnson has failed to demonstrate that the ALJ's evaluation of Dr. Way's opinion was unsupported by substantial evidence or controlled by an error of law. See infra Section C.

Johnson also argues that all of her conditions negatively interact with each other. For example, Johnson asserts that several of her physical conditions require exercise, which is impeded by other physical and mental conditions. Johnson also argues by way of example that her "pancreatitis adversely affects her diabetes which intensifies her chronic pain which worsens her anxiety and depression which increases her need to self-medicate by eating foods which aggravate her pancreatitis." (Pl.'s Br. 16, ECF No. 17 at 16.) Finally, Johnson argues that the ALJ failed to consider the side effects of her medications—asserting that they would further limit her mental capacity—as well as her noncompliance.

Upon review of the ALJ's decision, the court finds Johnson's arguments to be speculative and that they fail to meet the requisite standard of review. Moreover, the court observes that the ALJ



specifically found that Johnson "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments . . . ." (Tr. 15.) The ALJ expressly stated that he

> considered the cumulative effects of the claimant's alleged impairments, both severe and non-severe, on the claimant's ability to work. While the combination of the claimant's impairments imposes some limitations, there is no indication in the record that the claimant's ability to sustain consistent function has been complicated by the combination of these impairments. There is no evidence that the combination of the claimant's impairments imposes greater limitations than those established in the residual functional capacity stated below.

(Tr. 19.) Further, in assessing Johnson's residual functional capacity and considering Johnson's physical and mental impairments, the ALJ limited her to a reduced range of light work. In analyzing Johnson's residual functional capacity, the ALJ also discussed Johnson's medical records at length, including physical and mental findings, diagnostic images and testing results, and opinion evidence, as well as her testimony, and addressed conflicts in the records. (Tr. 19-24.)

For all of these reasons, the court finds the ALJ's analysis sufficiently demonstrates that he considered the combined effect of Johnson's impairments. See Brown v. Astrue, C/A No. 0:10-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012) (finding that Fourth Circuit precedent issued after Walker suggested that Walker was not meant to be used as a trap for the Commissioner). Moreover, even if the court were to find the ALJ's analysis was deficient, Johnson has failed to "adequately show the Court that the ALJ's decision could have been different had [he] done an adequate combined effect analysis of Plaintiff's multiple impairments." Cox, 2015 WL 1519763, at *6.

**B.    Listing 12.05**

At Step Three of the sequential analysis, the Commissioner must determine whether the claimant meets the criteria of one of the Listings and is therefore presumptively disabled. "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis added). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also meet the criteria found in the Listing of that impairment. 20 C.F.R. §§ 404.1525(d), 416.925(d). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. 20 C.F.R. §§ 404.1508, 416.908. The Commissioner can also determine that the claimant's impairments are medically equivalent to a Listing, which occurs when an impairment is at least equal in severity and duration to the criteria of a Listing. 20 C.F.R. §§ 404.1526(a), 416.926(a). Johnson argues that the ALJ erred in finding that she did not meet Listing 12.05 for Intellectual Disability.

> Listing 12.05 provides, in pertinent part:
>
> Intellectual Disability:  Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work related limitation of function;
>
> OR



D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
  1.  Marked restriction of activities of daily living; or
  2.  Marked difficulties in maintaining social functioning; or
  3.  Marked difficulties in maintaining concentration, persistence, or pace; or
  4.  Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpart P, App. 1, Listing 12.05.[3]

The United States Court of Appeals for the Fourth Circuit has made clear that in determining whether a claimant meets Listing 12.05, the ALJ must first find that the claimant satisfies the introductory paragraph to the Listing by finding that she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" before the age of 22.  Hancock v. Astrue, 667 F.3d 470, 473 (4th Cir. 2012).  This has been described by the Fourth Circuit as a separate prong, "Prong 1," to satisfy.  See id. at 473.  Next, the Listing requires a claimant to satisfy one of four additional requirements, categorized in the Listing as Requirements A-D.  Here, Requirement C is at issue, requiring an IQ score of 60-70, which the Fourth Circuit describes as "Prong 2," as well as a "physical or mental impairment imposing an additional and significant work-related limitation of function," identified as "Prong 3."  Id.  Also at issue is Requirement D, requiring an IQ score of 60-70, as well as two of the following:  marked restriction or difficulties in  daily living, or maintaining social functioning, or maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration.  Thus, Johnson's argument that her IQ score alone creates a presumption that she meets the introductory paragraph as well as Listing 12.05(C) flies in the face of the decision in Hancock, which is

---

[3] Effective September 3, 2013, the Social Security Administration replaced the term "Mental Retardation" with "Intellectual Disability" in Listing 12.05.  See Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01 (Aug. 1, 2013).  While medical records and case law predating September 3, 2013 utilize the "Mental Retardation" language, the court notes that the substance of the Listing has not changed.



precedential in this circuit.  (See Pl.'s Br. at 20, ECF No. 17 at 20 (citing Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001)).

Johnson also appears to raise numerous arguments regarding the manner in which the ALJ addressed the prongs of Listing 12.05(C) and (D).  However, contrary to any argument by Johnson, there is no dispute that the ALJ found Johnson met Prongs 2 and 3 of Listing 12.05(C).  Moreover, the court finds the ALJ's decision as a whole reflects that the ALJ found Johnson did not meet the introductory paragraph of Listing 12.05 as she failed to demonstrate deficits in adaptive functioning. Additionally, the ALJ found that Johnson did not meet the specifics of Requirement D.[4]   Thus, the court finds that remand is not warranted based on any argument Johnson may be presenting that rests on an allegation that the ALJ failed to make one of these findings or that the ALJ's findings were presented out of order.  The court finds that Johnson has failed to demonstrate any legal error by the ALJ in the Listings analysis.

Johnson's remaining arguments appear to allege that the ALJ's finding that Johnson did not demonstrate deficits in adaptive functioning was unsupported by substantial evidence.  In addressing the aspects of Listing 12.05 at issue here, the ALJ observed that "[w]hile Claimant satisfies the Listing l2.05C criteria, she must satisfy also the diagnostic description of intellectual disability, with regard to manifested deficits in adaptive functioning."  (Tr. 16.)  The ALJ continued, explaining as follows:

> Adaptive functioning refers to how effectively individuals cope with common life demands and how well he or she meets the standards of personal independence expected of someone in her particular age group, sociocultural background, and community setting. This is determined by [her] success in 11 areas: communication,

---

[4] Contrary to Johnson's arguments, the court finds that the ALJ's opinion does not indicate that the introductory paragraph and specifics in Requirement D are the same.



self-care, home living, social/ interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

(Id.) The ALJ proceeded to individually address each of the eleven areas listed above and ultimately found that "[a]fter careful consideration of the entire record, the claimant has failed to demonstrate deficits in adaptive functioning, as she was not enrolled in special education classes in school, she had a lengthy employment history, and managed her own finances. She was able to raise her children as a single parent, drive, shop, and seek health care when needed." (Tr. 18.) The ALJ also found that Johnson did not meet the Requirement D criteria as she had no restriction in activities of daily living; no more than mild difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation, which have been of an extended duration.

After careful consideration of the ALJ's decision, the record, and the parties's argument, for the reasons discussed below, the court finds that the ALJ considered the applicable factors in determining whether Johnson demonstrated deficits in adaptive functioning and that Johnson has failed to demonstrate that the ALJ analysis of these factors was unsupported by substantial evidence such that remand would be required.

**Adaptive Functioning Generally**

" '[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age . . . ." Program Operations Manual System ("POMS") § DI 24515.056(D)(2). "Adaptive activities" are described as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." Hawley v. Astrue, No. 1:09CV246, 2012 WL 1268475, at *5 (M.D.N.C.



Apr. 16, 2012) (citing Blancas v. Astrue, 690 F. Supp. 2d 464, 476 (W.D. Tex. 2010) (quoting 20 C.F.R. Pt. 404, Subpart P, App. 1, §§ 12.05, 12.00(C)(1)).  Deficits in adaptive functioning include limitations in "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." Jackson v. Astrue, 467 F. App'x 214, 218 (4th Cir. 2012) (citing Atkins v. Virginia, 536 U.S. 304, 308 n.3 (2002)).  Case law shows that the issue of whether a claimant manifested deficits in adaptive functioning during the developmental period is a fact-specific inquiry with few bright-line rules. See, e.g., Salmons v. Astrue, No. 5:10CV195-RLV, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012) (collecting cases).

Cases interpreting Listing 12.05 provide some parameters for an ALJ's conclusion on this issue.  Compare Hancock, 667 F.3d at 475-76 (affirming the Commissioner's determination that the claimant did not have the requisite deficits in adaptive functioning where the claimant had worked as a battery assembler and a drop clipper; performed tasks such as shopping, paying bills, and making change; took care of three small grandchildren at a level acceptable to the State Department of Social Services; did a majority of the household chores, attended school to obtain a GED; and did puzzles for entertainment) with Rivers v. Astrue, No. 8:10-cv-314-RMG, 2011 WL 2581447 (D.S.C. June 28, 2011) (reversing a finding of no deficits in adaptive functioning where the claimant was functionally illiterate, showed poor academic performance with multiple IQ tests in or before the third grade showing scores in the 50s, and dropped out of school in the ninth grade).  Cases interpreting Listing 12.05(C) also provide instruction on the factors that play into this determination. For example, even though IQ range constitutes the Prong 2 determination, the actual score is often considered in conjunction with the level of adaptive functioning.   See, e.g., Conyers v. Astrue, No.

4:11-CV-00037-D, 2012 WL 3282329, at *8 (June 29, 2012), adopted in 2012 WL 3283285 (E.D.N.C. Aug. 10, 2012); Holtsclaw v. Astrue, No. 1:10CV199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011) (both discussing the IQ score when considering the level of adaptive functioning at the Prong 1 inquiry); see also Norris v. Astrue, No. 7:07-CV-184-FL, 2008 WL 4911794, at *3 (E.D.N.C. Nov. 14, 2008) (noting that a diagnosis of mental retardation is possible with an IQ score of 70-75 when there are significant deficits in adaptive behavior and may not be supported even with an IQ score of below 70 when there are not significant deficits).  Moreover, in the absence of any evidence of a change in the claimant's intellectual functioning, the law assumes that the claimant's IQ has remained relatively constant.  Luckey v. U.S. Dep't of Heath & Human Servs., 890 F.2d 666, 668 (4th Cir. 1989).  Similarly, a claimant's diagnosis, if there is one, is pertinent:  when a claimant has been diagnosed as mildly mentally retarded in a Listing 12.05(C) case, courts are more likely to affirm a finding of deficits in adaptive functioning prior to age 22 than if the claimant has the lesser diagnosis of borderline intellectual functioning.  Conyers, 2012 WL 3282329, at *9 (discussing the claimant's level of adaptive functioning and noting that the claimant was classified in the low end of the spectrum of mildly mentally retarded);[5] Salmons, 2012 WL 1884485, at *5 (discussing the claimant's level of adaptive functioning and noting that the claimant was classified in the borderline intellectual functioning category).

Whether the claimant is illiterate is also an important factor.  See Luckey, 890 F.2d at 668-69; Salmons, 2012 WL 1884485, at *7; Holtsclaw, 2011 WL 6935499, at *4; Rivers, 2011 WL 2581447, at *3-4.  Similarly, whether the claimant has ever lived independently is a relevant inquiry.  Compare Salmons, 2012 WL 1884485, at *4 with Holtsclaw, 2011 WL 6935499, at *5.  Another

---

[5] Although Conyers was addressing Listing 12.05(B), diagnosis can be pertinent even when the issue is whether the Listing 12.05(C) criteria are met.



guiding factor is whether the claimant has ever provided care for others, or, conversely, whether he himself is dependent on others for care. Compare Salmons, 2012 WL 1884485, at *7 (noting the claimant was heavily dependent on his mother and was not responsible for the care or supervision of anyone else) and Holtsclaw, 2011 WL 6935499, at *4-5 (noting the claimant had never lived independently and required a parent's help) with Hancock, 667 F.3d at 475-76 (affirming denial of benefits where the claimant managed the household and cared for her three young grandchildren) and Caldwell v. Astrue, No. 1:09cv233, 2011 WL 4945959, at *3 (W.D.N.C. Oct. 18, 2011) (noting the claimant assisted in the care of an elderly parent).

School records and past academic performance are also important indicators of deficits in adaptive functioning prior to age 22. See Salmons, 2012 WL 1884485, at *7 ("[F]unctional academic skills is the primary measure of deficits of adaptive functioning before age 22."); Rivers, 2011 WL 2581447, at *3 (noting that the claimant was classified as special needs at school, had repeated evaluations in elementary school with IQ scores all in the 50s, and dropped out of school in the ninth grade); see also Conyers, 2012 WL 3282329, at *8-9 (discussing the claimant's school history). Additionally, work history, while it cannot preclude benefits where the Listing 12.05(C) criteria are otherwise met, Luckey, 890 F.2d at 669, can be relevant in determining whether a claimant manifested deficits in adaptive functioning prior to age 22. Hancock, 667 F.3d at 475-76 (concluding the ALJ's finding that the claimant did not manifest the requisite deficit in adaptive functioning to be supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked several jobs); Harts v. Astrue, C/A No. 0:10-1893-CMC-PJG, 2012 WL 529982, at *6 n.3 (D.S.C. Jan. 30, 2012) (distinguishing Luckey because the ALJ used the claimant's work history as only one factor to support his finding of no significant deficits in adaptive

functioning and because the claimant did not otherwise meet the Listing 12.05(C) criterion of a valid IQ score within the range of 60-70, <u>adopted and incorporated in</u> 2012 WL 529980 (D.S.C. Feb. 17, 2012). Finally, the tasks a claimant is able to undertake, although not determinative, have been considered in this analysis. <u>See generally</u> <u>Radford v. Astrue</u>, No. 5:08-CV-421-FL, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009) (finding that the claimant's ability to perform certain tasks was not inconsistent with mild mental retardation); <u>see, e.g.</u>, <u>Hancock</u>, 667 F.3d at 476 n.3 (affirming the ALJ's consideration of the claimant's ability to perform tasks such as shopping, paying bills, and making change); <u>Salmons</u>, 2012 WL 1884485, at *7 (discussing the claimant's inability to do household chores, cook, and drive).

**Application of the Factors**

The ALJ's decision reflects that he considered the factors discussed herein in reaching his conclusion; however, on appeal, Johnson attempts to attack some of the findings offered by the ALJ in analyzing these factors. The ALJ considered Johnson's communication—finding she was able to communicate without difficulty, was able to articulate effectively at the hearing, had a second-to-third-grade reading level, and had possessed a driver's license since the age of eighteen. With regard to self-care and home living, the ALJ found that Johnson independently raised twins as a single parent, took her medications independently, cared for her own hygiene, and helped her disabled parents. Addressing social skills, the ALJ found that Johnson spent time talking on the telephone and attending church and reported no difficulty getting along with others. The ALJ considered Johnson's use of community resources and found Johnson was able to drive, handle her own finances, shop, and seek health care when needed. In considering self-care, the ALJ reiterated that Johnson was independent in activities of daily living; was able to cook, shop, help her disabled



parents, and drive; took her own medications; and could check her blood glucose levels. With regard to Johnson's functional academic skills, the ALJ observed that Johnson quit school in the eighth grade and did not obtain her GED, but that there was no evidence in the record to support Johnson's allegation that she was in special education classes. The ALJ addressed Johnson's prior work, observing that she "worked on a regular and continuing basis from 1997 through part of 2004, performing semi-skilled work with an SVP of 3-4, according to the vocational expert"; was "able to complete driver's education and obtain her driver's license"; and "reported she was able to interact appropriately with others." (Tr. 17.) Next discussing leisure, the ALJ stated that Johnson spent time reading, watching television, talking on the telephone, visiting with her grandchildren, and attending church. With regard to health issues, the ALJ found that the "record reveals the claimant is able to seek health care when needed," "is able to manage her diabetes and take her medication," "has participated in physical therapy since her alleged onset date," and "has consistently been encouraged to exercise and lose weight." (Id.) Finally, the ALJ addressed safety, observing that Johnson was able to cook, drive, and help her disabled parents.

Johnson argues that the "factual foundation" for some of these factors was deficient. In support of her argument, Johnson first alleges that the ALJ mischaracterized some of the evidence. For example, Johnson argues that Johnson has always lived with her parents and therefore was part of a family unit raising her twins; that records reveal Johnson was noncompliant with taking her medication; and that Johnson testified she only picks up or cleans up or cooks a little bit. (See Pl.'s Br. at 22-23, ECF No. 17 at 22-23.) In her reply brief, Johnson also argues that the ALJ failed to acknowledge that "objective testing measures showed 'very limited' academic achievement, with grade-school equivalency in reading, spelling, and arithmetic." (Pl.'s Reply Br. at 3, ECF No. 21

at 3.)  She also argues that the record contains no school records at all to verify whether she was in special education classes because the the response from a records request indicated that there were no special education records on file. Johnson also argues that several years of work is a brief work history for a fifty-year-old woman, and that she obtained the job at the church daycare through her sister.  Johnson challenges the ALJ determination that she could manage her own funds and argues that the ALJ "unfairly indicated that Ms. Johnson could 'interact appropriately with others.' " (Pl.'s Reply Br. at 4, ECF No. 21 at 4.)

Because the ALJ has considered pertinent evidence and weighed appropriate factors in analyzing whether Johnson met Listing 12.05, the court cannot say the ALJ's determination that Johnson did not demonstrate the requisite deficits in adaptive functioning was not supported by substantial evidence or was controlled by error of law.  The fact that Johnson can point to other evidence that supports her position does not render the ALJ's decision unsupported.  See Hancock, 667 F.3d at 476.  In particular, in this case, it is clear that the ALJ was aware of the additional information that Johnson argues supports her position that the ALJ overstated or misrepresented the evidence in the section discussing Listing 12.05(C).  For example, the ALJ explicitly found that there was simply no evidence to support Johnson's allegation of being in special education classes, but he also observed that her reading level was at a second-to-third-grade level.  Moreover, the court notes that "this district has repeatedly upheld an ALJ's finding that a claimant did not have deficits in adaptive functioning based in part on a past ability to perform semi-skilled or skilled work." Weatherford v. Colvin, No. 6:13-1885-RMG, 2014 WL 3881056, at *10 (D.S.C. Aug. 5, 2014).  As noted above, work history, while it cannot preclude benefits where the Listing 12.05(C) criteria are otherwise met, Luckey, 890 F.2d at 669, can be relevant in determining whether a claimant

PJG

manifested deficits in adaptive functioning prior to age 22. See Hancock, 667 F.3d at 475-76 (concluding the ALJ's finding that the claimant did not manifest requisite deficits in adaptive functioning was supported by substantial evidence where the ALJ considered, among many other factors, that the claimant had worked semi-skilled jobs). Essentially, notwithstanding Johnson's arguments to the contrary, she is challenging the weight the ALJ gave to much of the evidence in this case when this evidence was clearly presented to and considered by the ALJ. Courts are "not at liberty to 'reweigh conflicting evidence . . . or substitute our judgment for that of the [ALJ].' " Hancock, 667 F.3d at 476 (quoting Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) and citing Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996) ("We must sustain the ALJ's decision, even if we disagree with it, provided the determination is supported by substantial evidence.")).

Upon review of the ALJ's decision as a whole, and considering all of the reasons offered by the ALJ in evaluating whether Johnson met Listing 12.05(C) or (D), the court finds that Johnson has failed to demonstrate that the ALJ's Listing analysis is unsupported by substantial evidence or controlled by an error of law. Therefore, remand is not warranted on this ground.

## C.     Residual Functional Capacity

Johnson argues that her residual functional capacity assessment is unsupported by substantial evidence based on her assertions that the ALJ mischaracterized the evidence. However, the court has reviewed the testimony and finds, for the reasons discussed below, that the alleged mischaracterizations do not render the ALJ's decision unsupported by substantial evidence or based on an error of law warranting remand.

Within this issue, Johnson also argues that the ALJ erred in evaluating the opinion evidence in this case. Regardless of the source, the Commissioner will evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416927(c). Typically, the Social Security Administration accords greater weight to the opinion of treating medical sources because treating physicians are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, a treating physician's opinion is evaluated and weighed "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Any other factors that may support or contradict the opinion should also be considered. 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). In the face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such an opinion. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Further, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Id. (quoting Craig, 76 F.3d at 590).

Additionally, SSR 96-2p provides that a finding that

a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p, 1996 WL 374188, at *5.  This Ruling also requires that an ALJ's decision "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  Id. at *5.

Moreover, the ALJs are instructed to apply the above factors—including the length and nature of the source's treatment relationship with the claimant, the supportability of the opinion, the opinion's consistency with the other evidence in the record, whether the source is a specialist, and any other factors that may support or contradict the opinion—to all medical opinions, including those from consultative examiners and medical sources who are not acceptable medical sources.[6]  20 C.F.R. §§ 404.1527(c), 416.927(c).  Importantly, generally more weight is given to the opinions of an examining source than a non-examining one.  Id.  Additionally, more weight is generally given to opinions of treating sources than non-treating sources, such as consultative examiners.  Id.

Johnson argues that the ALJ erred in discounting the following opinion evidence:

- a December 7, 2004 examination by Dr. James H. Way, a consultative examiner, indicating that Johnson "should be able to learn simple, rote, occupational tasks," but "is currently unlikely to be able to function even to this potential occupationally secondary to anxiety disorder, decreased confidence, and poor coping skills" (Tr. 288);

- a September 30, 2008 statement from Dr. C.D. Stokes of Walterboro Family Practice Associates that Johnson is "unable to work due to chronic medical illness" (Tr. 319);

- opinions from June 2011 and September 2012 from Dr. Robert Freeman of the Harvest Free Medical Clinic, both indicating that Johnson had "obvious" work-related limitation in functioning due to her mental condition (Tr. 431, 640); and

---

[6]  In evaluating opinions from other sources, not every factor may apply.  SSR 06-03p, 2006 WL 2329939, at *5.



- a Global Assessment of Functioning ("GAF") of 50 on August 25, 2011 by Dr. Cashton B. Spivey following an evaluation (Tr. 435).

(Pl.'s Br. at 25, 27-28, ECF No. 17 at 25, 27-28; see also Tr. 22-23.)  Johnson also argues that the ALJ improperly gave significant weight to a March 10, 2004 statement from Dr. David J. Baggett, a treating source, that Johnson was "physically and mentally fit to work in a daycare center" (Tr. 318).  (Pl.'s Br. at 26-27, ECF No. 17 at 26-27; see also Tr. 22.)

Review of the ALJ's decision reveals that the ALJ discussed each opinion and appears to have applied the relevant factors in weighing all of the opinion evidence.  With regard to Dr Way, the ALJ summarized the findings from Dr. Way's consultative examination and observed that Dr. Way concluded as follows:

> [T]he claimant could perform basic self-care tasks and other basic activities of daily living, follow simple instructions, and learn simple, rote, occupation tasks.  However, at that time, she was unlikely to be able to function even to that potential occupationally secondary to her untreated anxiety disorder, decreased confidence, and poor coping skills.  He also noted that the claimant was incapable of managing her funds.

(Tr. 22.)  The ALJ accorded limited weight to Dr. Way's opinion, observing that Johnson "was able to work for years at a semi-skilled job.  She also raised twins as a single parent.  Furthermore the claimant was receiving no type of mental health treatment, and although it was recommended, she has not sought such."  (Id.)  In providing significant weight to Dr. Baggett's opinion, the ALJ observed that Dr. Baggett was a treating source, that Dr. Baggett indicated Johnson was recently seen in his office, and that his opinion was consistent with the objective medical evidence of record.  The ALJ gave limited weight to Dr. Stokes's opinion, noting that it was penned on a prescription pad and finding it was "not supported by any objective medical evidence of record dates near that period of time."  (Tr. 22.)  The ALJ also discussed Dr. Freeman's June 3, 2011 opinion, first observing that

Dr. Freeman reported Johnson was prescribed clonazepam for anxiety and depression. The ALJ further found that

> [t]he claimant's mental status examination was unremarkable but for a worried/anxious mood and affect. Dr. Freeman stated that medication helped the claimant's condition, and that psychiatric care had not been recommended. However, he nonetheless reported that the claimant had an "obvious" work-related limitation in functioning, due to her mental condition. He further noted that the claimant was capable of managing her funds. Little weight is accorded to that portion of Dr. Freeman's opinion, with regard to the claimant having an "obvious" work-related limitation in functioning, due to her mental condition, as it is inconsistent with her generally benign mental status examination. Furthermore, if the claimant had an "obvious" work-related limitation in functioning, due to her mental condition, it would be reasonable to recommend psychiatric care.

(Tr. 22-23.) The ALJ also found that Dr. Freeman's September 2012 opinion was the same as his June 2011 opinion except that it added that Johnson took Ambien for insomnia. Therefore, the ALJ accorded it the same weight as the first opinion, for the same reasons. With regard to Dr. Spivey, the ALJ summarized Dr. Spivey's findings and conclusions from the August 2011 psychological evaluation. The only conclusion to which the ALJ accorded no weight that Johnson challenges is the GAF assessment. Specifically, the ALJ found that a GAF score of 50[7] was inconsistent with Dr. Spivey's examination of Johnson and was accorded no weight.

---

[7] With regard to GAF scores, the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fourth edition ("DSM-IV"), contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning. A GAF score may reflect the severity of symptoms or impairment in functioning at the time of the evaluation. Id. at 32-33. According to the DSM-IV, a GAF score between 41 and 50 may reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34. Importantly, a "[p]laintiff's GAF score is only a snapshot in time, and not indicative of [her] long term level of functioning." Parker v. Astrue, 664 F. Supp. 2d 544, 557 (D.S.C. 2009). Further, the court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF. American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed. 2013) ("DSM-V").

*PJG*

Johnson argues that the ALJ selectively credited one opinion—an opinion Johnson alleges she requested to get a job that she later quit because of her back and anxieties—over all the other opinions in the record to support a conclusion he wanted to reach. Johnson further challenges the reasons offered by the ALJ to discount the above opinions. For example, Johnson attacks each reason offered for discounting part of Dr. Way's opinion, asserting that she ultimately quit the semi-skilled position because "it just got too much," arguing that the record does not suggest she raised the twins as a single mother because Johnson has always resided with her parents, and pointing out that she has a history of receiving treatment for anxiety and depression. (Pl.'s Br. at 14, ECF No. 17 at 14.) Johnson argues with regard to Dr. Freeman's opinion that the ALJ supplemented his observations over the expert's opinions in finding that if Johnson had an obvious work-related limitation in functioning, it would be reasonable to recommend psychiatric care. She also argues that the ALJ's finding that a doctor's GAF determination was inconsistent with the very examination on which the opinion was based is "more than just illogical—it is simply indefensible." (Pl.'s Br. at 28, ECF No. 17 at 28.)

Upon thorough review of the ALJ's decision and the record, the court concludes that the ALJ applied the relevant factors in evaluating the opinion evidence, and finds that Johnson has failed to demonstrate that the ALJ's evaluation of these opinions is unsupported by substantial evidence or based on an incorrect application of the law. See 20 C.F.R. §§ 404.1527(c), 416.927(c); Mastro, 270 F.3d at 178 (stating that "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight") (internal quotation marks and citation omitted); Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) ("An ALJ's determination as to the weight to be assigned to a medical opinion generally will

not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' . . . or has failed to give a sufficient reason for the weight afforded a particular opinion[.]") (internal citations omitted).  The decision reflects that the ALJ weighed these opinions and reasonably found that the medical findings and observations in the record did not support all of them.[8]  Although Johnson may be able to point to select medical records that arguably support the opinions, she has failed to demonstrate that the ALJ's findings are unsupported by substantial evidence.  In fact, it is clear that the ALJ, as part of his duties in weighing the evidence, properly relied on medical records, treatment notes, examination findings, and other support for the opinions.  See Craig, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the ALJ's responsibility, not the court's, to determine the weight of evidence and resolve conflicts of evidence).

Thus, the court finds that Johnson has not shown that the ALJ's decision with regard to the opinion evidence, and ultimate determination with regard to Johnson's residual functional capacity, was unsupported by substantial evidence or reached through application of an incorrect legal standard.[9]  Moreover, contrary to Johnson's arguments and even considering these allegations

---

[8]  Moreover, the court notes that to the extent any doctor opined that Johnson is disabled or unable to work, such an opinion is reserved to the Commissioner and not entitled to special significance.  See 20 C.F.R. §§ 404.1527(d), 416.927(d) (explaining that the issue of whether a claimant is disabled or unable to work is reserved to the Commissioner, and opinions by medical sources on that point are not entitled to special significance).

[9]  To the extent that Johnson's reply brief may be construed as raising additional arguments for the first time, the court finds these cursory arguments to be without merit.  Ultimately, Johnson has failed to demonstrate that the ALJ's evaluation of the record in this matter was unsupported by substantial evidence or reached through the application of an incorrect legal standard.



together—the alleged mischaracterizations of the evidence and the alleged errors in evaluating the opinion evidence—remand is not warranted.

## RECOMMENDATION

For the foregoing reasons, the court finds that Johnson has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard.  See Craig, 76 F.3d at 589; see also 42 U.S.C. § 405(g); Coffman, 829 F.2d at 517.  The court therefore recommends that the Commissioner's decision be affirmed.

December 6, 2016                                                  Paige J. Gossett
Columbia, South Carolina                                 UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).